**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C. Henry Ekweani and Ijeamaka Ekweani, husband and wife,<br><br>            Plaintiffs,<br><br>vs.<br><br>Maricopa County Sheriff's Office, et al.,<br><br>            Defendants. | No. CV-08-01551-PHX-FJM<br><br>**ORDER** |

The court has before it defendants Joseph Arpaio, Maricopa County, David Campbell, Kenneth Martinez, and Jerry Bruen's motion for summary judgment (doc. 77), *pro se* plaintiffs C. Henry and Ijeamaka Ekweani's response (doc. 87), and defendants' reply (doc. 100). We also have before us plaintiffs' motion for partial summary judgment (doc. 79), defendants' response (doc. 91), and plaintiffs' reply (doc. 95). Finally, we have before us plaintiffs' motion for leave to supplement their reply (doc. 101), defendants' response (doc. 102), and plaintiffs' reply (doc. 103).

As an initial matter, we note that plaintiffs' affidavits merely attest to the facts jointly argued in their briefs and listed in their statements of fact. They are not made on personal knowledge as required by Rule 56(e), Fed. R. Civ. P. Nevertheless, plaintiffs' deposition testimony includes the relevant information based on personal knowledge. We will rely on

it where necessary.

**I.**

In August 2007, plaintiffs were moving into a recently completed house in the Desert Hills area of northern Maricopa County. Ijeamaka was in the process of moving from Maryland to join Henry in Arizona. On August 21, 2007, plaintiffs dined out with their daughters, who were staying at a hotel in Scottsdale. Henry had two glasses of wine. Ijeamaka had a cocktail and a glass of wine. After visiting with their daughters at the hotel, plaintiffs set out for Desert Hills.

About 1:00 A.M., Ijeamaka was pulled over by Maricopa County Sheriff's Office Deputy David Campbell after he noticed that she was driving well below the speed limit. Deputy Kenneth Martinez and Sergeant Jerry Bruen arrived shortly thereafter in response to a request for assistance. When Ijeamaka refused a field sobriety test, Campbell arrested her for driving while under the influence and placed her in his patrol car. Although Henry wanted to take plaintiffs' car, the deputies requested that it be towed to an impound lot because they believed Henry was intoxicated.

As it turned out, the significant event of plaintiffs' traffic stop is what happened to their house keys. According to plaintiffs, the keys to their Desert Hills house were on a ring with the car's ignition key. It is undisputed that Martinez removed the ignition key, but he says that there were no other keys attached to it. Martinez gave the ignition key to Campbell. In a booking statement, Campbell later wrote that the keys attached to the ignition key were removed and placed in Ijeamaka's purse. He says that he never saw plaintiffs' house keys. There was a set of keys in Ijeamaka's purse, but it held keys to her house, office, and car in Maryland. Plaintiffs concede that they never saw defendants in possession of their house keys. The keys were eventually found in plaintiffs' car when it was recovered from the impound lot the following day.

Campbell took Ijeamaka to a Cave Creek substation for processing, while Martinez and Bruen stayed with Henry and the car. After the car was towed, Martinez gave Henry a ride to plaintiffs' house. Martinez, who had Ijeamaka's purse, tried the Maryland keys on

the house without success. He was able to gain entrance to plaintiffs' detached casita, which had a bathroom, bedroom, and electricity. Henry was apparently concerned with the prospect of staying there because the casita should have been locked, it was unfurnished, and it had some electrical issues.

Before Martinez left, Henry called 911. Over the next two hours, plaintiffs would call 911 eight times, and a non-emergency Maricopa County Sheriff's Office number an additional eight times. Defendants provide an audio recording of each call. In his first call, Henry told the operator that Martinez was abandoning him without a key to his house. Martinez told him to hang up, but he refused. Henry gave the phone to Martinez, who explained to the operator that he did not have the keys to plaintiffs' house. After Martinez left, Henry called 911 again. He said that the officers had the keys to his house. The operator explained that he should not be calling 911 without an emergency. Henry replied that it was an emergency and he would continue to call 911 until he got inside his house. The operator told him that he could be arrested for that, and asked if Henry understood him. Henry said that he would continue calling. The operator said, "And sir, we will arrest you, do you understand that?" Henry replied, "Then arrest me." DSOF, Ex. 9, Track 2.

About an hour later, around 3:20 A.M., Campbell and Martinez returned to plaintiffs' house to drop off Ijeamaka after she was cited and released. When they left, plaintiffs began calling 911, simultaneously at one point. Henry called 911 three times. Ijeamaka called 911 twice before switching to a non-emergency number she was given, which she called five times. An operator suggested breaking a window to gain access to their house, and offered to send out an officer out to assist in doing so. Plaintiffs were emphatic that they wanted their keys and it was an emergency. During one call, Henry told an operator in a raised voice that he wanted the police to actually arrest him because he needed to have a place to sleep, and maybe he should sleep at the police station. During her calls, Ijeamaka said that she was a black woman in the middle of Desert Hills who was scared for her life. She called the officers crazy and racist. Ijeamaka was warned that her husband could not call 911 and harass the operators and that he would go to jail if he did not stop. She was asked to stop

- 3 -

1    calling and informed that she was abusing the system.

2    Around 3:44 A.M., an operator told Campbell that plaintiffs had called 911 seven
3    times about their keys. Campbell contacted his supervisor, Bruen, who told him to go to
4    plaintiffs' house and advise them not to call 911 unless they had an emergency. Campbell
5    and Martinez arrived about 3:50 A.M. According to the deputies, plaintiffs were yelling
6    about their house keys. According to plaintiffs, the deputies were berating them about
7    calling 911. It is undisputed that the situation was contentious. It is also undisputed that
8    Martinez stated, "Didn't I tell you not to call 911?" DSOF ¶ 77. Henry concedes that he told
9    the deputies that he had a right to call 911 if he felt that he had an emergency, that they had
10   the keys to his house, and that they needed to return the keys. DSOF-2, Ex. 1 at 64.

11   At that point, Campbell arrested Henry. Henry says that he told the deputies that he
12   should be arrested. According to Henry, Campbell told him to turn around, which he did.
13   While Campbell was handcuffing him, Henry says that he "felt a thunderous blow behind my
14   back" and that is all he remembers until he was being led to Campbell's patrol car. Id. at 65-
15   66. Campbell says that he grabbed Henry's left arm and told him that he was under arrest,
16   but Henry locked his left arm to his side, stepped away from him, and flailed his right arm.
17   Campbell says that he pulled Henry to the ground to gain control of him. The struggle
18   allegedly lasted seven to ten seconds. Henry was wearing shorts and a short-sleeved shirt.
19   He says that he suffered scrapes and bruises on his hands, chest, and knees. He also says that
20   he felt severe pain in his back and shoulder. He does not offer any medical evidence,
21   although he apparently saw a doctor twice after the incident. When the deputies left with
22   Henry, they told Ijeamaka not to call 911 again.

23   At about 4:00 A.M., Ijeamaka called the non-emergency number and asked to speak
24   with the most senior officer on duty. She was told that a sergeant would call her. When
25   Ijeamaka called back, she was told that a sergeant was on his way to speak with her in
26   person. She called again to say that she would rather speak with someone on the phone. She
27   then called 911 and left a message that she did not want a white officer coming to her house
28   and that she was scared that she would be shot. When Bruen was told that Ijeamaka called

again, he went to plaintiffs' house with Martinez. They knocked on the casita door and asked Ijeamaka to step outside. When she did, Bruen grabbed her by the arm and arrested her.

Plaintiffs were both charged with false reporting to a law enforcement agency, A.R.S. § 13-2907.01, but these charges were not pursued. Henry was also charged with resisting arrest, A.R.S. § 13-2508. Before a grand jury, Campbell answered in the affirmative when asked whether it took a few minutes to get Henry detained. The grand jury returned an indictment for resisting arrest. In May 2008, the Superior Court of Arizona in Maricopa County held an evidentiary hearing in which the court noted the difference between Campbell's grand jury testimony and his subsequent testimony that the struggle lasted a matter of seconds. The court suggested that the case against Henry would be unlikely to survive a motion for judgment of acquittal under Rule 20, Ariz. R. Crim. P. The court granted the prosecutor's subsequent motion to dismiss without prejudice. In July 2008, the prosecutor filed a complaint in Justice Court charging Henry with resisting arrest and harassment, A.R.S. § 13-2921. On a special action in Superior Court, these charges were dismissed with prejudice in July 2009 due to a *prima facie* violation of Henry's speedy trial rights. Rule 8.2, Ariz. R. Crim. P. The state's appeal from this ruling is pending before the Arizona Court of Appeals.

Plaintiffs allege claims under 42 U.S.C. § 1983 and the Fourth Amendment for false arrest and, with respect to Henry's arrest, excessive force. They also allege state law claims for malicious prosecution, violations of the Arizona Constitution, false arrest, assault and battery, abuse of process, intentional infliction of emotion distress, negligence, gross negligence, and conspiracy. Defendants move for summary judgment on, or dismissal of, all claims. Plaintiffs move for partial summary judgment on a malicious prosecution claim.

## II. § 1983 False Arrest

To prevail on a claim under 42 U.S.C. § 1983, plaintiffs must show a violation of a right secured by the Constitution or laws of the United States by a person acting under the color of state law. Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). Plaintiffs contend that defendants arrested them without probable cause in violation of the

Fourth Amendment. "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." Brooks v. City of Seattle, 599 F.3d 1018, 1023 (9th Cir. 2010). The crime in question can be a closely related offense that was not invoked by the arresting officer, as long as it involves the same conduct for which the person was arrested. Blankenhorn v. City of Orange, 485 F.3d 463, 473 (9th Cir. 2007).

Defendants contend that they had probable cause to arrest plaintiffs for harassment. We agree. As defined, "harassment" is conduct directed at a specific person that would cause a reasonable person to be seriously alarmed, annoyed, or harassed, and the conduct in fact does so. A.R.S. § 13-2921(E). A person commits harassment if, with intent to harass or with knowledge that he is harassing another person, he communicates with another person by telephone in a manner that harasses or repeatedly commits an act that harasses another person. A.R.S. § 13-2921(A). Martinez was present when Henry first called 911. He told him to hang up and that he did not have plaintiffs' house keys. Plaintiffs do not dispute that an operator informed Campbell that plaintiffs were repeatedly calling 911 about their keys. When Campbell and Martinez arrived at plaintiffs' house to advise them to stop calling, Henry said that he had a right to call 911 and that the deputies needed to return his keys. Under these circumstances, a reasonably prudent person would believe that Henry was harassing an operator. Similarly, Bruen had reason to believe that Ijeamaka committed harassment, given the cumulative effect of her calls, when he was told that she had called again.

In response, plaintiffs point out that Henry was never given a non-emergency number and that Ijeamaka switched to calling a non-emergency number, at least until her final call. An abusive, harassing phone call to 911 is more likely to be seriously annoying under A.R.S. § 13-2921(E), but the statute is not limited to harassing 911 calls. In any case, defendants had reason to believe that plaintiffs were calling 911 when they were arrested.

Plaintiffs also claim that their conduct was not directed at a specific person, as required by A.R.S. § 13-2921(E), because they talked with multiple operators. However, the

- 6 -

statute is broad enough to cover indiscriminate harassment directed at the specific persons who answered plaintiffs' calls, and defendants had reason to believe that plaintiffs were harassing the operator who spoke with them. Because plaintiffs' arrests were supported by probable cause, we grant defendants' motion for summary judgment on plaintiffs' § 1983 false arrest claims.

### III. § 1983 Excessive Force

Plaintiffs claims that defendants violated § 1983 and the Fourth Amendment by using excessive force to arrest Henry. Fourth Amendment excessive force claims are evaluated using an "objective reasonableness" standard. Brooks, 599 F.3d at 1025. Whether the use of force is reasonably necessary depends on the totality of the circumstances, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or fleeing. Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). "Reasonableness is judged from the perspective of a reasonable officer on the scene, making allowances for the split-second judgments officers are required to make in tense, uncertain, and rapidly-evolving situations." Brooks, 599 F.3d at 1025 (quotation omitted).

First, we assess the amount of force used. Id. Viewed in his favor, Henry's account of a thunderous blow behind his back while he was facing away from Campbell and being handcuffed is consistent with Campbell's statement that he took Henry to the ground while attempting to handcuff him. Taking someone to the ground in a manner that would result in scrapes, bruises, and temporary back and shoulder pain does not involve a particularly significant amount of force.

Second, we look to the three factors from Graham. Campbell arrested Henry for abusing the 911 system with probable cause to arrest him for committing harassment. False reporting under A.R.S. § 13-2907.01, the original charge, and harassment under A.R.S. § 13-2921(A) are misdemeanors. The severity of the crime is low. That said, Henry's continued 911 calls posed a threat to the community to the extent that he was preventing operators from taking emergency calls. Based on Henry's account, he did little to suggest that he was

1  physically dangerous. On the other hand, the situation was contentious when the deputies
2  arrived at plaintiffs' house at nearly 4:00 A.M. and Henry had been drinking. In response
3  to a statement about his 911 calls, Henry said that he had a right to call 911 and that the
4  officers needed to return his keys, despite numerous admonitions that defendants did not
5  have his keys. A suspect who repeatedly refuses to comply with instructions "escalates the
6  risk involved for officers unable to predict what type of noncompliance might come next."
7  Id. at 1028-29. According to Henry, he did not resist arrest or attempt to flee. Weighing the
8  Graham factors in light of the totality of the circumstances, and drawing all inferences in
9  Henry's favor, we conclude that Campbell's use of force was reasonable. "Not every push
10  or shove" in the course of making an arrest amounts to a constitutional violation. Graham,
11  490 U.S. at 396, 109 S. Ct. at 1872. We grant defendants' motion for summary judgment on
12  plaintiffs' § 1983 excessive force claim.

**IV. Qualified Immunity**

With respect to plaintiffs' § 1983 claims, defendants also maintain that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, __ U.S. __, __, 129 S. Ct. 808, 815 (2009) (quotation omitted). Because plaintiffs fail to show the violation of a federal right, we conclude that defendants are immune from plaintiffs' § 1983 claims.

**V. State Law Claims**

Plaintiffs also allege state law claims for malicious prosecution, violations of the Arizona Constitution, false arrest, assault and battery, abuse of process, intentional infliction of emotional distress, negligence, gross negligence, and conspiracy.

A claim for malicious prosecution does not accrue until the prior proceedings have terminated in the accused's favor, including any pending appeal that could lead to further proceedings. See Moran v. Klatzke, 140 Ariz. 489, 490, 682 P.2d 1156, 1157 (Ct. App. 1984) (civil); Restatement (Second) of Torts § 659(f) (criminal). If a malicious prosecution

claim is filed prior to a favorable termination of the proceedings, it is premature and subject to dismissal. Moran, 140 Ariz. at 490, 682 P.2d at 1157. Defendants contend primarily that plaintiffs' malicious prosecution claims should be dismissed because Henry's prosecution is currently on appeal to the Arizona Court of Appeals.[1] Although plaintiffs maintain that the pending appeal is frivolous, they do not dispute defendants' contention that their claims are premature, and instead request that we defer ruling until the Arizona Court of Appeals resolves the appeal. Because plaintiffs' malicious prosecution claims are premature, we will dismiss them. Accordingly, we deny as moot plaintiffs' partial motion for summary judgment on a malicious prosecution claim (doc. 79) and their motion for leave to supplement a reply in connection with filing a notice of claim (doc. 101).

Next, plaintiffs claim that defendants violated the Victim's Bill of Rights, Due Process of Law, and Right to Privacy provisions of the Arizona Constitution. Article 2, §§ 2.1, 4, 8. Defendants contend that these claims fail for the same reasons as plaintiffs' federal claims, and that they are otherwise not cognizable as private causes of action for damages. The existence of such claims under the Arizona Constitution is unresolved. See Howell v. Hodap, 221 Ariz. 543, 548, 212 P.3d 881, 886 (Ct. App. 2009) (Right to Privacy claim). We note that there is a statutory cause of action for damages against governmental entities for violations of the Victim's Bill of Rights, A.R.S. § 13-4437, but the rights in question only arise on the arrest or formal charging of a person alleged to be responsible for a criminal offense against a victim. A.R.S. § 13-4402. Plaintiffs allege that Henry was the victim of an assault by Campbell, but they do not suggest that Campbell was arrested or charged with a crime. In any case, plaintiffs fail to respond to defendants' contention that their claims under the Arizona Constitution are not cognizable. Therefore, we grant defendants' motion for summary judgment on these claims.

Defendants challenge plaintiffs' state law false arrest claims on the same grounds as

---

[1] Defendants also contend that plaintiffs cannot show a lack of probable cause to support a claim for malicious prosecution. However, they do not address the resisting arrest charge against Henry in their motion for summary judgment.

their § 1983 false arrest claims. In Arizona, an officer is authorized to arrest someone if he has probable cause to believe that the person committed a misdemeanor. A.R.S. § 13-3883(A)(4). The probable cause analysis and result are the same as under the Fourth Amendment. Thus, we grant defendants' motion for summary judgment on plaintiffs' state law false arrest claims.

Plaintiffs allege assault and battery claims against defendants based on Campbell's use of force in arresting and handcuffing Henry and Bruen's use of force in grabbing Ijeamaka's arm and handcuffing her. Defendants assert that their conduct was justified, and thus not subject to civil liability. A.R.S. § 13-413. Threatening or using physical force in making an arrest is justified as long as (1) a reasonable person would believe that such force is immediately necessary to effect the arrest; (2) such person makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and (3) a reasonable person would believe the arrest to be lawful. A.R.S. § 13-409. There is no question that plaintiffs knew that they were being arrested on account of their phone calls, and we have already determined that their arrests were lawful. Under the circumstances, and drawing all inferences in Henry's favor, we conclude that Campbell's use of physical force was reasonably necessary for the same reasons discussed above in connection with plaintiffs' excessive force claim under the Fourth Amendment. We also conclude that grabbing Ijeamaka's arm and placing her in handcuffs was a reasonable use of force in the course of making an arrest. Because defendants' conduct was justified, they are not subject to civil liability. A.R.S. § 13-413. We grant defendants' motion for summary judgment on plaintiffs' assault and battery claims.

To prevail on an abuse of process claim, a plaintiff must show "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." Crackel v. Allstate Ins. Co., 208 Ariz. 252, 257, 92 P.3d 882, 887 (Ct. App. 2004) (quotation omitted). Defendants maintain that plaintiffs present only a generalized allegation that defendants have misused the litigation process, which would not support a claim for abuse of process. Id. at 258, 888. In response, the only process for which plaintiffs

1  identify an improper purpose is the decision to appeal the dismissal of the charges against Henry in 2009. Plaintiffs contend that the appeal was filed for the sole purpose of enabling defendants to argue to this court that plaintiffs' malicious prosecution claims are premature. Defendants point out that the appeal in question was filed over a year after plaintiffs' complaint was filed, and they assert that they were not involved with the decision to file the appeal. The only evidence plaintiffs offer on this point is an inadmissible hearsay statement from their former lawyer concerning the prosecutor's decision to dismiss Henry's original prosecution with or without prejudice in June 2008. PSOF-2, Ex. 10 at 2. They do not offer any evidence that defendants were involved with the decision to file the appeal. We grant defendants' motion for summary judgment on plaintiffs' abuse of process claims.

A plaintiff may recover on a claim for intentional infliction of emotional distress "only where the defendant's acts are so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Patton v. First Fed. Sav. & Loan Ass'n of Phoenix, 118 Ariz. 473, 476, 578 P.2d 152, 155 (1978) (quotation omitted). Defendants point out that plaintiffs lack evidence of any conduct approaching this threshold. Plaintiffs do not contend otherwise. We grant defendants' motion for summary judgment on plaintiffs' intentional infliction of emotional distress claims.

To establish a claim for negligence, a plaintiff must prove (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of the standard by the defendant; (3) causation; and (4) actual damages. Gipson v. Kasey, 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007). Gross negligence is "wanton misconduct that is flagrant and evinces a lawless and destructive spirit." Badia v. City of Casa Grande, 195 Ariz. 349, 356, 988 P.2d 134, 141 (Ct. App. 1999) (quotation omitted). Defendants contend that plaintiffs lack evidence that they breached their duty to act as reasonably prudent law enforcement officers under the circumstances. Plaintiffs fail to address their negligence claims in their response. Generally, they request that the court deny defendants' motion for summary judgment on all of the claims that they do not specifically mention based on defendants removing their house

keys and refusing to return them. Under the circumstances, defendants' failure to secure plaintiffs' house keys during a traffic stop where only one person was detained does not raise a triable issue on negligence. We grant defendants' motion for summary judgment on plaintiffs' negligence claims.

To recover damages caused by a civil conspiracy, a plaintiff must show that two or more individuals accomplished an underlying tort which they agreed to commit. Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 498, 38 P.3d 12, 36 (2002). Because plaintiffs fail to raise a triable issue on an underlying tort, we grant defendants' motion for summary judgment on plaintiffs' conspiracy claims.

**IT IS THEREFORE ORDERED GRANTING** defendants' motion for summary judgment (doc. 77). Plaintiffs' malicious prosecution claims are dismissed as premature. Summary judgment is granted in favor of defendants on all other claims.

**IT IS FURTHER ORDERED DENYING** plaintiffs' motion for partial summary judgment (doc. 79).

**IT IS FURTHER ORDERED DENYING** as moot plaintiffs' motion for leave to supplement (doc. 101).

The clerk shall enter final judgment.

All remaining pending motions are denied on grounds of mootness. The final pretrial conference and trial date are vacated on grounds of mootness.

DATED this 24th day of May, 2010.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge